1   BENBROOK LAW GROUP, PC
    BRADLEY A. BENBROOK (SBN 177786)
2   STEPHEN M. DUVERNAY (SBN 250957)
    701 University Avenue, Suite 106
3   Sacramento, CA 95825
    Telephone: (916) 447-4900
4   brad@benbrooklawgroup.com
    steve@benbrooklawgroup.com
5
    Attorneys for Plaintiffs
6

7

8

9

10
                    UNITED STATES DISTRICT COURT
11
                  SOUTHERN DISTRICT OF CALIFORNIA
12

13
    CHRISTOPHER J. HOFFMAN; CHAD          Case No.: 3:24-cv-664-CAB-MMP
14  ORRIN; JENNIFER SENSIBA; and
    FIREARMS POLICY COALITION,            **MEMORANDUM OF POINTS AND**
15  INC.,                                 **AUTHORITIES IN SUPPORT OF**
                                          **PLAINTIFFS' MOTION FOR**
16               Plaintiffs,              **SUMMARY JUDGMENT**

17          v.

18
    ROB BONTA, in his official capacity as   Date: N/A
19  Attorney General of California,          Time: N/A
                                             Courtroom: 15A (15th Floor)
20                                           Judge: Hon. Cathy Ann Bencivengo
                 Defendant.
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 2

    A.    Statutory and Regulatory Background ................................................. 2

    B.    Procedural History ............................................................................... 3

LEGAL STANDARD ........................................................................................... 5

ARGUMENT ........................................................................................................ 5

I.    California's Non-Resident Carry Ban Violates The Second Amendment ..... 5

    A.    The Second Amendment's Plain Text Covers Plaintiffs' Conduct ..... 6

    B.    California Cannot Show That Its Non-Resident Carry Ban Is Consistent With The Nation's Historical Tradition Of Firearms Regulation ........ 6

    C.    California's Purported Historical Analogues Are Not Relevantly Similar To California's Non-Resident Carry Ban .............................. 8

II.    California's Non-Resident Carry Ban Violates The Privileges And Immunities Clause ................................................................................................... 13

    A.    The Non-Resident Carry Ban Impinges Upon The Fundamental Right To Keep And Bear Arms .................................................................... 15

    B.    The Non-Resident Carry Ban Is Not Adequately Tailored To A Substantial State Interest .................................................................... 16

V.    CONCLUSION ............................................................................................ 17

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................... 5

*Austin v. New Hampshire*,
   420 U.S. 656 (1975) ............................................................................. 14

*Baird v. Bonta*,
   81 F.4th 1036 (9th Cir. 2023) ................................................................ 8

California Rifle & Pistol Ass'n, Inc. v. Los Angeles Cnty. Sheriff's Dep't,
   No. 2:23-cv-10169, 2024 WL 4875390 (C.D. Cal. Aug. 20, 2024) ....... 9

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ............................................................................... 5

*Corfield v. Coryell*,
   6 F. Cas. 546 (C.C.E.D. Pa. 1823) ....................................................... 15

*Council of Ins. Agents & Brokers v. Molasky-Arman*,
   522 F.3d 925 (9th Cir. 2008) ............................................................... 14

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ............................................................................... 5

*Espinoza v. Montana Dep't of Revenue*,
   591 U.S. 464 (2020) ............................................................................... 7

*Hague v. Comm. for Indus. Org.*,
   307 U.S. 496 (1939) ............................................................................. 14

*Hicklin v. Orbeck*,
   437 U.S. 518 (1978) ............................................................................. 15

*In re Oracle Corp. Secs. Litig.*,
   627 F.3d 376 (9th Cir. 2010) ................................................................. 5

*Lara v. Comm'r Pa. State Police*,
   91 F.4th 122 (3d Cir. 2024) ................................................................... 7

*Marilley v. Bonham*,
   844 F.3d 841 (9th Cir. 2016) ......................................................... 14, 15

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ......................................................................... 5, 15

*Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Berch*,
   773 F.3d 1037 (9th Cir. 2014) ............................................................. 14

*New York State Rifle & Pistol Association v. Bruen*,
   597 U.S. 1 (2022) .......................................................................... passim

*Olivier v. Baca*,
   913 F.3d 852 (9th Cir. 2019) ................................................................. 5

*Paul v. State of Virginia*,
   75 U.S. 168, 8 Wall. 168 (1868) ..................................................... 2, 14

*Ramos v. Louisiana*,
   590 U.S. 83 (2020) ................................................................................. 7

*Rhode v. Bonta*,
   713 F. Supp. 3d 865 (S.D. Cal. 2024) ................................................. 12

*Saenz v. Roe*,
  526 U.S. 489 (1999)................................................................ 14

*Supreme Court of Virginia v. Friedman*,
  487 U.S. 59 (1988)................................................... 14, 15, 16

*Supreme Ct. of New Hampshire v. Piper*,
  470 U.S. 274 (1985)................................................................ 15

*Timbs v. Indiana*,
  586 U.S. 146 (2019)................................................................. 7

*Toomer v. Witsell*,
  334 U.S. 385 (1948)............................................................ 2, 14

*Travis v. Yale & Towne Mfgr. Co.*,
  252 U.S. 60 (1920)............................................................. 2, 14

*United Bldg. and Constr. Trades Council v. Camden*,
  465 U.S. 208 (1984)................................................................ 15

*United States v. Harrison*,
  654 F. Supp. 3d 1191 (W.D. Okla. 2023) .............................. 12

*United States v. Rahimi*,
  602 U.S. 680 (2024).......................................................... 7, 8, 13

*Virginia v. Moore*,
  553 U.S. 164 (2008)................................................................. 7

**Statutes**

Acts Respecting the Indians, ch. 58, § 2, 1633 Mass. Laws 37 ................. 11

Cal. Penal Code § 25400 ............................................................. 2

Cal. Penal Code § 25850 ............................................................. 2

Cal. Penal Code § 26150 ............................................................. 2

Cal. Penal Code § 26150(a)(3) ...................................................... 3

Cal. Penal Code § 26155 ............................................................. 2

Cal. Penal Code § 26155(a)(3) ...................................................... 3

Cal. Penal Code § 26220(b) .......................................................... 3

Cal. Penal Code § 26350 ............................................................. 2

The True-Blue Laws of Connecticut and New Haven and the False Blue Laws
  Forged by Peters 92 ................................................................ 11

**Other Authorities**

THE FEDERALIST NO. 42 ................................................................ 13

THE FEDERALIST NO. 80 ................................................................ 13

**Rules**

Fed. R. Civ. P. 56(a) .................................................................. 5

**Constitutional Provisions**

U.S. CONST., Art. IV, § 2, cl. 1 ...................................................... 13

# INTRODUCTION

In *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1, 31 (2022), the Supreme Court held that the law-abiding citizens of this Nation have a "general right to publicly carry arms for self-defense" and therefore states cannot condition exercise of that right on the showing of an atypical need for self-defense. California, however, prevents law-abiding citizens of the United States who do not reside in California from exercising their constitutionally protected right to carry loaded, operable firearms in public when they are present in California. State law prohibits individuals from carrying firearms in public without a license, and state law also prohibits non-residents from getting licensed. California's unconstitutionally restrictive scheme provides no path for non-residents to carry a firearm lawfully in public at all. As a result, individuals such as Plaintiffs Hoffman, Orrin, and Sensiba, who have been issued carry licenses in their respective home states, are barred from lawfully carrying a firearm in public for self-defense when they visit California.

This ban is unconstitutional. Individuals do not lose protection of their rights under the First Amendment's speech or religion clauses when they cross state lines. Nor do they lose their protections under the Fourth Amendment's prohibition on unreasonable searches and seizures. They likewise do not surrender their Second Amendment protected rights when they travel outside their home state. *Cf. Bruen*, 597 U.S. at 24 (standard adopted in *Bruen* "accords with how we protect other constitutional rights").

California's prohibition on non-resident carry violates the constitution in two respects. *First*, it violates the Second Amendment. *Bruen* leaves no doubt that the Second Amendment "presumptively guarantees" Plaintiffs' right to carry arms in public for self-defense. 597 U.S. at 33. Therefore, California bears the burden of demonstrating that the ban is consistent with the Nation's historical tradition of firearm regulation. The State cannot do so because there is no well-established and

representative historical tradition of prohibiting law-abiding citizens who cross state lines from bearing arms.

*Second*, California's licensing scheme violates the Privileges and Immunities Clause of Article IV, Section 2 of the United States Constitution because it favors California residents and discriminates against non-residents in the exercise of a fundamental right. That Clause "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Toomer v. Witsell*, 334 U.S. 385, 395 (1948) (citing *Paul v. State of Virginia*, 75 U.S. 168, 8 Wall. 168, 180 (1868); and *Travis v. Yale & Towne Mfg. Co.*, 252 U.S. 60, 78 (1920)). And it expressly bars "discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States." *Toomer*, 334 U.S. at 396. Yet that is precisely what California's non-resident carry ban does here.

This Court should enter a judgment that declares California's non-resident carry ban unconstitutional and enjoins Defendant (and all those under Defendant's supervision, including sheriffs) from enforcing the residency requirement for carry applications with respect to otherwise qualified individuals who are not California residents.

## BACKGROUND

**A.    Statutory and Regulatory Background.**

California law prohibits individuals from carrying concealed handguns in public. *See* Cal. Penal Code § 25400. State law likewise broadly prohibits the open carry of firearms. *See id.* § 25850 (prohibiting the open carry of a loaded firearm); § 26350 (prohibiting the open carry of an unloaded handgun in public). Law-abiding individuals can avoid Section 25400's ban on concealed carry, however, by securing a license to carry a concealed weapon from their county sheriff or local police chief. *See id.* §§ 26150; 26155. State law provides no similar licensure for open carry.

Non-residents, however, cannot apply for concealed carry licenses because they are expressly excluded from California's licensing regime. For standard two-year licenses valid throughout the State, California requires that an applicant reside in the local permitting jurisdiction. Cal. Penal Code § 26155(a)(3). The statutory scheme contains a narrow exception that allows licensing authorities to issue 90-day licenses to individuals who do not reside within a jurisdiction if they maintain a "principal place of employment or business" and "spend[] a substantial period of time in that place of employment or business." Cal. Penal Code §§ 26220(b); 26150(a)(3). This exception, however, appears to only be available to California residents who live in one county but work in a neighboring county. *See* Cal. Penal Code § 26220(b) (providing that a "licensee shall give a copy of this license to the licensing authority of the city, county, or city and county in which the licensee resides," and that a license can be renewed or extended only with the "concurrence" of "the licensing authority of the city, county, or city and county in which the licensee resides"). Even if non-residents could technically apply for a license under the business/employment exception, this is a not a meaningful path for non-residents to exercise their Second Amendment protected rights: Ordinary non-California residents do not have a "principal place of employment or business" in California, and, in any event, the Individual Plaintiffs do not qualify for this exception.

## B.    Procedural History.

Plaintiffs Christopher J. Hoffman, Chad Orrin, and Jennifer Sensiba ("Individual Plaintiffs") are law-abiding, responsible adults who live outside of California.

Hoffman is a resident of Pittsburgh, Pennsylvania. Hoffman lived in California until 2012, and frequently returns to San Diego County to visit family and friends. Plaintiff Hoffman held a CCW issued by the San Diego County Sheriff's Office on multiple occasions starting in 1990 until he moved to Nevada in 2012. Hoffman was issued a CCW by the Las Vegas Metropolitan Police Department in 2012, and

currently has an active CCW issued by the Allegheny County Sheriff's Office in Pennsylvania. In 2023, Hoffman applied to the San Diego County Sheriff's Department for a CCW license; that application was denied because Hoffman is a Pennsylvania resident and therefore not eligible for licensure under California law. Hoffman Decl., ¶¶ 2–5.

Orrin is a resident of Idaho. Under Idaho law, Orrin has the right to carry a concealed firearm without a license. Before moving to Idaho in 2020, Orrin held a CCW issued by the Placer County Sheriff's Office. Before moving to Placer County, Orrin lived in Madera County, where he held a CCW license issued by the Madera County Sheriff's Office for several years. Orrin has also held a non-resident CCW license in the state of Utah. Orrin Decl.,¶¶ 2–4.

Sensiba is a resident of New Mexico. Sensiba has an active CCW license issued by the New Mexico Department of Public Safety; she also has an active non-resident CCW valid in the state of Utah. Plaintiff Sensiba previously held CCW licenses in Arizona and Texas. Plaintiff Sensiba is a certified firearms instructor. Sensiba Decl., ¶¶ 2–3.

Each of the Individual Plaintiffs desires to carry a firearm in public for self-defense while he or she visits California and would do so if California law permitted them to. California's restrictions have prevented the Individual Plaintiffs from exercising their Second Amendment protected rights while visiting California. Aside from the fact that they are not California residents, Plaintiffs are each qualified to receive a California CCW license based on the application criteria set forth pursuant to California Penal Code §§ 26175 and 26202. Plaintiffs seek to secure their right to apply for a California CCW license on par with California residents who may apply under the State's general licensing regime, and they would apply for such a license if California provided them an opportunity to do so. Hoffman Decl., ¶¶ 6–7; Orrin Decl., ¶¶ 5–6; Sensiba Decl., ¶¶ 4–5.

The Individual Plaintiffs are all members of Plaintiff Firearms Policy Coalition. Hoffman Decl., ¶ 8; Orrin Decl.,¶ 7; Sensiba Decl., ¶ 6.

Plaintiffs filed this lawsuit on April 11, 2024, alleging that California's non-resident carry ban violates the Second Amendment and the Privileges and Immunities Clause of Article IV, Section 2 of the U.S. Constitution.

## LEGAL STANDARD

The Court must grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is only material if it could affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where, as here, the opposing party will have the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (quoting *Celotex*, 477 U.S. at 325); *accord In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

## ARGUMENT

### I.    California's Non-Resident Carry Ban Violates The Second Amendment.

The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008); *Bruen*, 597 U.S. at 20 (quoting *Heller*). The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742 (2010). Importantly, the Supreme Court has stressed that the standard adopted in *Heller* and elaborated in *Bruen* "accords with how we protect other constitutional rights." *Bruen*, 597 U.S. at 24; *see also id.* at 70 (observing that "[w]e know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need" and contrasting operation of First Amendment and Sixth Amendment). In this respect, it goes without saying

that Americans do not surrender their First Amendment rights to free speech and free exercise of religion when they cross state lines. Nor do they surrender their Fourth Amendment protections against unreasonable searches and seizures, or the Sixth Amendment's right to confront one's accusers. They likewise do not forfeit their Second Amendment protected right to carry firearms when they cross state lines.

To determine whether a firearm regulation is constitutional under *Bruen*, the analysis begins with the question whether the Second Amendment's plain text covers an individual's conduct; if so, the Constitution presumptively protects that conduct. *See Bruen*, 597 U.S. at 22–24. If that requirement is satisfied, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. In other words, it is California's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19 (cleaned up); *see also id.* at 60 ("[W]e are not obliged to sift the historical materials for evidence to sustain [the State's] statute. That is respondents' burden."). California is unable to do so here.

## A.    The Second Amendment's Plain Text Covers Plaintiffs' Conduct.

The textual portion of the Second Amendment analysis is straightforward. Plaintiffs are among "the people," and *Bruen* has already established that the conduct that they wish to engage in—carrying firearms in public for self-defense—is covered by the plain text of the Second Amendment. 597 U.S. at 32–33. Accordingly, "the Constitution presumptively protects that conduct." *Id.* at 24.

## B.    California Cannot Show That Its Non-Resident Carry Ban Is Consistent With The Nation's Historical Tradition Of Firearms Regulation.

Under *Bruen*, the burden now shifts to California. It must show that its non-resident carry ban is "consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 34. "[W]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to

'justify its regulation.'" *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (quoting *Bruen*, 597 U.S. at 24). And it must do so by offering persuasive legal history. *See Bruen*, 597 U.S. at 25 & n.6 (courts "decide a case based on the historical record compiled by the parties"). Under *Bruen* and *Rahimi*, three methodological considerations must guide California's presentation (and the Court's consideration) of the State's historical evidence.

First, the key historical starting point when assessing analogues under *Bruen* is the Founding Era, centering on the date of the Second Amendment's ratification in 1791. *See Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134 (3d Cir. 2024). While *Bruen*, 597 U.S. at 37–38, and *Rahimi*, 602 at 692 n.1, both acknowledged the "academic debate" over whether courts should also consider the regulatory tradition as of the adoption of the Fourteenth Amendment in 1868, the Supreme Court has separately addressed that debate through its longstanding practice of looking to 1791 when analyzing the content of incorporated rights. Most prominently, in *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464 (2020), the Court held that Montana's "no-aid" law, which banned recipients of public tuition assistance from using the funds to attend religious schools, violated the Free Exercise Clause. When Montana pointed to 30 states that adopted similar no-aid laws "in the second half of the 19th century," the Court rejected that trend as coming too late. *Id*. at 482; *see id.* ("The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause."); *see also Ramos v. Louisiana*, 590 U.S. 83, 90–91 (2020) (discussing the history of a unanimous jury right by referencing "young American states" and the "backdrop" of the ratification of the Bill of Rights in 1791); *Timbs v. Indiana*, 586 U.S. 146, 150 (2019) (discussing "colonial-era provisions" and the "constitutions of eight States" when analyzing the Eighth Amendment excessive fines clause); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *Bruen*, 597 U.S. at 82–83 (Barrett, J., concurring) (noting

that "freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning" of the Second Amendment is improper).

Second, to be a "proper analogue[,]" a law must be "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. In other words, the modern regulation must impose a "comparable burden on the right of armed self-defense" as did the historical regulation, and for a similar reason. *Id.*; *see Rahimi*, 602 U.S. at 692. This requirement means that historical laws arising in different contexts, and for different reasons, will be inapt comparators.

Third, historical analogues must be part of a tradition that was "broadly in effect" at ratification, *Baird v. Bonta*, 81 F.4th 1036, 1040–41 (9th Cir. 2023), like the affray and surety traditions relied on in *Rahimi*, which were "[w]ell entrenched in the common law" by the Founding. *See Rahimi*, 602 U.S. at 693–95. Laws existing in only a handful of jurisdictions—historical "outliers"—should be disregarded. *Bruen*, 597 U.S. at 30 (cleaned up). A smattering of regulations cannot establish a "historical tradition" of regulation sufficient to inform the original public meaning of the right. *See, e.g.*, *id.* at 65 (rejecting restrictions in one state statute and two state court decisions as not representative); *id.* at 46 (doubting that "three colonial regulations could suffice to show a tradition of public-carry regulation").

At bottom, the analogical analysis is focused on determining "whether the challenged regulation is consistent with the principles that underpin the Nation's regulatory tradition." *Rahimi*, 602 U.S. at 692. California cannot possibly carry that burden here because there is no well-established and representative historical tradition of prohibiting law-abiding citizens who cross state lines from bearing arms.

## C.    California's Purported Historical Analogues Are Not Relevantly Similar To California's Non-Resident Carry Ban.

At the outset, Plaintiffs note that another district court has already considered and rejected California's attempt to justify its non-resident carry ban under *Bruen*. In

*California Rifle & Pistol Ass'n, Inc. v. Los Angeles Cnty. Sheriff's Dep't*, the State asserted that its regulatory scheme was consistent with a handful of "locality-based licensing laws" from the mid-19th century and that it found further support in three early-20th-century state laws to prohibited non-residents from applying for carry licensees. No. 2:23-cv-10169, 2024 WL 4875390, at *16–17 (C.D. Cal. Aug. 20, 2024).

In holding that California failed to carry its burden under *Bruen*, the Central District observed that "[t]he only historical analogues offered by the State that involve a remotely similar method of burdening Second Amendment conduct, namely, limiting exercise of Second Amendment rights to a state's own residents, are the 20th century laws in Georgia, Oregon, and West Virginia." *Id.* at *17. While these laws imposed a comparable burden on Second Amendment protected conduct, they flunked *Bruen*'s test in two critical ways. First, the State failed to provide sufficient information to show that these laws were comparably justified (*i.e.*, to evaluate *Bruen*'s "why" metric). *Id.* at *18. Second, and more critically, by providing only three laws from the early 1900s, California failed to provide "analogues [that] derive from the relevant period" or show that these laws "represent a consensus or tradition from other states." *Id.* The court explained:

> Without identifying any similar laws before *either* the Founding or Reconstruction, the State has not carried its burden at this stage to show that the limitation of CCW licenses to California residents is part of a historical tradition of this Nation. [Citation] That there were laws from the Founding era demonstrating a (purported) consensus among the states of regulating the manner of carrying within each state does not, as the State argues, speak to whether the States during the Founding era limited the ability to carry firearms to only their residents. The State has pointed the Court to no history on that point. The State has thus failed to demonstrate that it is likely that its residency requirement to apply for a CCW license is part of a historical tradition of this Nation.

*Id.* (citation to *Bruen* and footnote omitted).

Although it remains to be seen how California will attempt to meet its burden this time, the State's expert materials confirm that it faces the same fate here as it did in *California Rifle & Pistol Association*.

The State has offered a declaration from Professor Robert Spitzer, which generally reviews historical weapons licensing laws before briefing identifying a few isolated laws that imposed some restrictions on the sale, carry, or use of arms to people who did not live in the community.[1] *See* Spitzer Decl., ¶¶ 66–78. From these licensing regulations Spitzer divines a general tradition of "ensuring that the carrying or use of firearms is reserved for persons properly eligible to do so, as an exercise of state power to promote lawful and responsible behavior fundamental to the safety of state residents." *Id.*, ¶ 79. But this generalized argument fails on its face: Plaintiffs seek only the opportunity to apply for a carry license on equal footing with Californians, such that the State would have the opportunity to confirm their eligibility for licensure and subject non-resident licensees to the same oversight that already applies to California residents. Thus, there is no public-safety risk associated with permitting non-residents to apply.

Setting that fundamental point aside, these laws fall short of what *Bruen* requires in several respects. First, Spitzer leads with four colonial laws (from 1633 in Massachusetts, 1642 in Connecticut, 1771 in New Jersey, and 1768 in North Carolina), two of which predated the Founding by 150 years. Spitzer Decl., ¶¶ 67–70. *Bruen* already called into question precisely this sort of gambit, expressing "doubt that *three* colonial regulations could suffice to show a tradition" of historical regulation. 597 U.S. at 46.

In any event, these laws bear no resemblance to California's across-the-board prohibition on non-resident carry. The 1633 Massachusetts law that purportedly banned the providing of arms or ammunition to non-residents was part of that colony's laws generally prohibiting trade with Indians:

> Nor shall any person sell, give or barter, directly or indirectly, any gun or guns, powder, bullets, shot, lead, to any Indian whatsoever, or to any

---

[1] Plaintiffs focus solely on the declaration of Professor Spitzer because he expressly offers an opinion on historical analogues. California has disclosed two additional experts, though it is unclear how the State will rely on their opinions.

> persona inhabiting out of this jurisdiction; Nor shall any amend or repair any gun belonging to any Indian, nor shall sell any armour or weapons, upon penalty of ten pounds for every gun, armour or weapons so sold, given or bartered, five pounds for every pound of powder, forty shillings for every pound of shot or lead, and proportionably for any greater or lesser quantity.

*See* Spitzer Decl., ¶ 67 & n.97 ("Acts Respecting the Indians, ch. 58, § 2, 1633 Mass. Laws 37"). The explanatory notes decry that "the French and Dutch and other foreign nations do ordinarily trade guns, powder, shot &c. with Indians, to our great prejudice, and strengthening and animating the Indians against us," while at the same time those nations "prohibit[ed] all trade with the Indians within their respecctive jurisdictions . . . ." Acts Respecting the Indians, ch. 58, § 2 (attributed to 1665).

The 1642 Connecticut law likewise was part of the colony's effort to prohibit "selling guns and powder to Indians" by addressing the potential that their adversaries would be armed "by indirect means":

> Whereas, it doth appear that notwithstanding the former laws made against selling guns and powder to Indians, they are yet supplied by indirect means, it is therefore ordered and declared, that if any person . . . shall sell, barter, or transport any guns, powder, bullets or lead, to any person inhabiting out of this jurisdiction, without license of this court or from some two magistrates, he shall forfeit for every gun ten pounds, for every pound of gunpowder five pounds, for every pound of bullets or lead forty shillings, and so proportionably for any greater or lesser quantity . . . .

*See* Spitzer Decl., ¶¶ 55 n.87, 68 & n.98; The True-Blue Laws of Connecticut and New Haven and the False Blue Laws Forged by Peters 92 (J. Hammond Trumbull, ed. 1876) ("The First Code of Laws, 1650").

Because these laws were discriminatory and targeted a small subset of the population, they should be left in the dustbin of history, not used as tools to restrict rights in the modern day. *Cf. Bruen*, 597 U.S. at 58 (cautioning against reliance on laws where prosecutions were directed only against "black defendants who may have been targeted for selective or pretextual enforcement"). Moreover, at the time, Indians were not even considered to be among "the People" protected under the Constitution, and thus laws aimed at them are no guide as to how the Constitution should be interpreted to apply to "the People" today. *See, e.g.*, *United States v. Harrison*, 654 F.

Supp. 3d 1191, 1216 (W.D. Okla. 2023) ("Indians . . . were  . . . generally not considered to be a part of the political community protected by the Second Amendment."); *Rhode v. Bonta*, 713 F. Supp. 3d 865, 883 (S.D. Cal. 2024) ("It makes little sense to argue . . . that historical restrictions placed on non-citizens, who were not accorded constitutional protections, now justify placing similar modern restrictions on citizens who do enjoy constitutional rights.").

Moreover, to the extent California may manufacture a generalized rationale that partially overlaps with a reformulation of the actual anti-Indian motivations behind these regulations (the "why" under *Bruen*), these laws do not impose a comparable burden on armed self-defense (the "how"). *Bruen*, 597 U.S. at 29. In particular, the Massachusetts law did not apply across the board to all non-residents, and neither law prohibited non-residents from carrying arms or ammunition they already owned while traveling through these colonies.

The New Jersey and North Carolina laws are both hunting laws directed at the preservation of deer within the respective colonies. Spitzer Decl., ¶¶ 69–70. Such laws were motivated by a different concern (preservation of deer) and imposed a far lesser burden on armed self-defense (they restricted only hunting, not bearing arms generally). The three additional mid-19th century hunting regulations in South Carolina, Maryland, and Delaware identified by Spitzer, *id.*, ¶ 70, flunk *Bruen*'s "how" and "why" tests for the same reason.

The next handful of regulations identified by Spitzer undermine the State's case even further. An 1881 New York City regulation expressly provided non-residents with the opportunity to apply for a carry license; the 1899 Wyoming measure likewise allowed non-residents to apply for a gun license (though it imposed a higher fee for the application); and early-20th century laws from Pennsylvania, Utah, and Delaware likewise allowed non-residents to obtain hunting licenses. Spitzer Decl., ¶¶ 71–73. These too-late-in-time 19th century laws *allowing* non-residents to keep and carry

arms do nothing to establish a historical tradition of *barring* non-residents from exercising a right to carry arms for self-defense.

Finally, Spitzer turns to a few 20th-century licensing laws that either implicitly or explicitly included residency requirements. Spitzer Decl., ¶¶ 74–78 These regulations are insufficient as well. Legislation enacted so many years after the Founding is irrelevant to determining the scope of the Second Amendment. Indeed, the Supreme Court in *Bruen* refused to even "address any of the 20th-century historical evidence" offered by New York and its *amici*, since it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." 597 U.S. at 66 n.28. And these few laws, standing alone, are not sufficiently widespread to be "well-established and representative" of the Nation as a whole. *See Bruen*, 587 U.S. at 30.

In sum, California's non-resident carry ban is not "consistent with the principles that underpin the Nation's regulatory tradition." *Rahimi*, 602 U.S. at 681.

## II.    California's Non-Resident Carry Ban Violates The Privileges And Immunities Clause.

The Privileges and Immunities Clause of Article IV, Section 2 of the United States Constitution provides: "The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." U.S. CONST., Art. IV, § 2, cl. 1.

The Founders and Framers understood the importance of ensuring that citizens could freely exercise their fundamental, constitutionally protected rights in each and every state in the Union. THE FEDERALIST NO. 42 (James Madison) ("Those who come under the denomination of free inhabitants of a State, although not citizens of such State, are entitled, in every other State, to all the privileges of free citizens of the latter; that is, to greater privileges than they may be entitled to in their own State . . . ."), THE FEDERALIST NO. 80 (Alexander Hamilton) (hailing the Privileges and Immunities Clause as "the basis of the Union").

This "provision was designed 'to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned.'" *Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 64 (1988) (quoting *Paul*, 8 Wall. at 180). The Clause "establishes a norm of comity without specifying the particular subjects as to which citizens of one State coming within the jurisdiction of another are guaranteed equality of treatment." *Austin v. New Hampshire*, 420 U.S. 656, 660 (1975). According to the Supreme Court, "the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State" is "expressly protected by the text of the Constitution" via the Privileges and Immunities Clause. *Saenz v. Roe*, 526 U.S. 489, 501 (1999). Moreover, the Clause "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Toomer*, 334 U.S. at 395 (citing *Paul*, 8 Wall. at 180, 181; and *Travis*, 252 U.S. at 78). And it expressly bars "discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States." *Toomer*, 334 U.S. at 396. Put simply, "[t]he purpose of the Privilege and Immunities Clause is to prevent 'a state from discriminating against citizens of other states in favor of its own.'" *Nat'l Ass'n for the Advancement of Multijurisdiction Prac. v. Berch*, 773 F.3d 1037, 1046 (9th Cir. 2014) (quoting *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 511 (1939)).

"A challenge under the Privileges and Immunities Clause entails 'a two-step inquiry.'" *Marilley v. Bonham*, 844 F.3d 841, 846 (9th Cir. 2016) (en banc) (quoting *Friedman*, 487 U.S. at 64). "First, [a court] decide[s] whether the activity in question is 'sufficiently basic to the livelihood of the nation . . . as to fall within the purview of the Privileges and Immunities Clause.'" *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 934 (9th Cir. 2008) (quoting *Friedman*, 487 U.S. at 64). The plaintiff bears the initial burden of "show[ing] that the challenged law treats nonresidents differently from residents and impinges upon a 'fundamental' privilege

or immunity protected by the Clause." *Marilley*, 844 F.3d at 846 (quoting *United Bldg. and Constr. Trades Council v. Camden*, 465 U.S. 208, 218 (1984)); *see Corfield v. Coryell*, 6 F. Cas. 546, 551 (C.C.E.D. Pa. 1823) (Washington, J.) (No. 3,230) (the Clause applies to rights "which belong, of right, to the citizens of all free governments").

"[A]t step two the burden shifts to the state to show that the challenged law is 'closely related to the advancement of a substantial state interest.'" *Marilley*, 844 F.3d at 846 (quoting *Friedman*, 487 U.S. at 65); *see also Hicklin v. Orbeck*, 437 U.S. 518, 526 (1978) (emphasizing that "there must be a 'reasonable relationship between the danger represented by non-citizens, as a class, and the . . . discrimination practiced upon them'" (citation omitted)). In this inquiry, "the availability of less restrictive means" guides the Court's analysis of whether a discriminatory law is adequately tailored. *Supreme Ct. of New Hampshire v. Piper*, 470 U.S. 274, 284 (1985).

### A.     The Non-Resident Carry Ban Impinges Upon The Fundamental Right To Keep And Bear Arms.

At the first step, California's licensing scheme implicates the Privileges and Immunities Clause because it favors California residents and discriminates against non-residents in the exercise of a fundamental right. Indeed, the Second Amendment is applicable against the states *because* it protects a fundamental right of citizens. *McDonald*, 561 U.S. at 791. Moreover, the Supreme Court recognized in *Bruen* that "[t]he Second Amendment's plain text thus presumptively guarantees . . . a right to 'bear' arms in public for self-defense." 597 U.S. at 33. Accordingly, Plaintiffs' desire to obtain the carry license necessary to exercise their Second Amendment protected rights "'fall[s] within the purview of the Privileges and Immunities Clause.'" *Friedman*, 487 U.S. at 64 (citation omitted).

1

## B.    The Non-Resident Carry Ban Is Not Adequately Tailored To A Substantial State Interest.

At the second step, California's choice to fully deprive non-residents of any opportunity to carry firearms in public violates the Clause because "the degree of discrimination" against non-residents does not "bear[] a close relation" to any justification the State could offer in defense. *See Friedman*, 487 U.S. at 67. The State's expert materials suggest that it will seek to justify the ban by asserting that California's regulatory scheme ensures that only qualified individuals are entitled to carry. But Plaintiffs do not seek *reciprocity* based on their out-of-state concealed carry licenses, nor do Plaintiffs assert that they are *entitled* to obtain a California concealed carry license without taking the same steps a resident would have to take.[2] Rather, Plaintiffs seek to vindicate their right to equal treatment such that they can apply for a license to carry on par with California residents. In other words, Plaintiffs ask only that they be subject to precisely the same application process, background check, training requirements, and oversight as generally apply to California residents. And Plaintiffs only seek to obtain CCW licenses that are subject to the same conditions and limitations as generally apply to Californians. In short, if the State has public safety concerns with issuing licenses to non-residents, "it can protect these interests through other equally or more effective means that do not themselves infringe constitutional protections." *Friedman*, 487 U.S. at 69.

\*    \*    \*

In sum, California's non-resident carry ban violates the Privileges and Immunities Clause.

---

[2] Plaintiffs do not concede that California's very burdensome licensing regime comports with the Second Amendment, but that question is not at issue here.

1

**CONCLUSION**

2     For the reasons set forth above, the Court should grant Plaintiffs' motion for

3 summary judgment.

4

5   Dated:  January 31, 2025                BENBROOK LAW GROUP, PC

6                                           By  s/ Bradley A. Benbrook
                                            BRADLEY A. BENBROOK
7                                           STEPHEN M. DUVERNAY
                                            Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28