1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  NICHOLAS R. GREEN
   WILL SETRAKIAN
4  Deputy Attorneys General
   State Bar No. 335045
5    300 South Spring Street, Suite 1702
     Los Angeles, CA 90013-1230
6    Telephone: (213) 269-6668
     E-mail: William.Setrakian@doj.ca.gov        *Exempt From Filing Fees Pursuant*
7  *Attorneys for Defendant Attorney General of*          *to Gov. Code § 6103*
   *California Rob Bonta*
8
                 IN THE UNITED STATES DISTRICT COURT
9
                FOR THE SOUTHERN DISTRICT OF CALIFORNIA
10

11

12

13 | **CHRISTOPHER J. HOFFMAN, ET AL.,**  | 3:24-cv-00664-CAB-MMP |

14

15                              Plaintiffs,

                                           **DEFENDANT'S OPPOSITION TO**
16          v.                             **PLAINTIFFS' MOTION FOR**
                                           **SUMMARY JUDGMENT &**
                                           **NOTICE OF MOTION AND**
17 **ROB BONTA, in his official capacity**  **CROSS-MOTION FOR SUMMARY**
   **as Attorney General of California,**   **JUDGMENT**
18
                               Defendant.   Date:        To Be Set
19                                          Time:        To Be Set
                                            Dept:        15A
20                                          Judge:       Hon. Cathy Ann
                                                         Bencivengo
21                                          Trial Date:  Not Yet Set
                                            Action Filed: April 11, 2024
22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

**Page**

3   Notice of Motion and Motion For Summary Judgment ............................................. 1

4   Introduction............................................................................................................... 1

    Statement of the Case ................................................................................................ 2

5       I.      Statutory Background ................................................................................. 2

6       II.     The Material, Undisputed Facts ................................................................. 3

7   Summary Judgment Standard..................................................................................... 3

    Argument ................................................................................................................... 4

8       I.      The Attorney General Is Entitled to Summary Judgment on
                Plaintiffs' Second Amendment Claim ....................................................... 4
9
                A.      The Supreme Court's Second Amendment Jurisprudence.......... 4
10
                B.      Plaintiffs' Proposed Course of Conduct Is Not Covered by
11                      the Plain Text of the Second Amendment. ................................... 7

12              C.      California's CCW Licensing Laws Are Consistent with
                        the Principles Underlying the Second Amendment. ................. 10
13
                        1.      Relevant Period ............................................................... 10
14
                        2.      Relevant Principles.......................................................... 11

        II.     Plaintiffs Are Not Entitled To Summary Judgment On Their
15              Privileges And Immunities Clause Cause of Action ........................... 17

16  Conclusion ............................................................................................................. 22

17

18

19

20

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Adickes v. S.H. Kress & Co.*
   398 U.S. 144 (1970) ................................................................. 4

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986) ................................................................. 3

*Antonyuk v. James*
   120 F.4th 941 (2d Cir. 2024) ................................................. 10

*Arizona Att'ys for Crim. Just. v. Mayes*
   127 F.4th 105 (9th Cir. 2025) ................................................. 9

*Avalos v. Baca*
   596 F.3d 583 (9th Cir. 2010) ................................................. 4

*B & L Prods., Inc. v. Newsom*
   104 F.4th 108 (9th Cir. 2024) ................................................. 7

*Bach v. Pataki*
   408 F.3d 75 (2d Cir. 2005) ............................................. 20, 21

*Carr v. State*
   34 Ark. 448 (1879) ............................................................... 16

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986) ............................................................... 4

*City of L.A. v. Patel*
   576 U.S. 409 (2015) ............................................................... 9

*Culp v. Raoul*
   921 F.3d 646 (7th Cir. 2019) ................................... 18, 20, 21

*District of Columbia v. Heller*
   554 U.S. 570 (2008) ....................................................... *passim*

*Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*
   249 F.3d 1132 (9th Cir. 2001) ............................................... 4

ii

1

2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

4

*Kolbe v. Hogan*
  849 F.3d 114 (4th Cir. 2017) .................................................................. 5

5

6

*Marilley v. Bonham*
  844 F.3d 841 (9th Cir. 2016) ............................................................. 17, 18

7

8

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
  475 U.S. 574 (1986) ............................................................................... 3

9

10

*McDonald v. City of Chicago*
  561 U.S. 742 (2010) ....................................................................... *passim*

11

*Moody v. NetChoice, LLC*
  603 U.S. 707 (2024) ............................................................................... 8

12

13

*NetChoice v. Bonta*
  — F. Supp. 3d — (N.D. Cal. Dec. 31, 2024) ......................................... 8

14

15

*New York State Rifle & Pistol Association v. Bruen*
  597 U.S. 1 (2022) ........................................................................... *passim*

16

17

*Project Veritas v. Schmidt*
  125 F.4th 929 (9th Cir. 2025) ................................................................ 8

18

19

*Smith v. State*
  50 Tenn. 511 (1871) ............................................................................. 16

20

*Supreme Court of New Hampshire v. Piper*
  470 U.S. 274 (1985) ..................................................................... 17, 18, 21

21

22

*Supreme Court of Virginia v. Friedman*
  487 U.S. 59 (1988) .................................................................... 17, 18, 19, 21

23

24

25

*United Bldg. & Const. Trades Council of Camden Cnty. & Vicinity v.*
  *Mayor & Council of City of Camden*
  465 U.S. 208 (1984) ............................................................................. 18

26

27

*United States v. Diaz*
  854 F. Appx 386, 389 (2nd Cir. 2021) ................................................. 20

28

iii

1
2

# TABLE OF AUTHORITIES
### (continued)

Page

3
4
5

*United States v. Nevens*
   No. CR 19-774-DMG, 2022 WL 17492196 (C.D. Cal. Aug. 15, 2022) ........................................................................................ 8

6

*United States v. Perez-Garcia*
   96 F.4th 1166 (9th Cir. 2024) ........................................... 4, 10, 16

7
8

*United States v. Rahimi*
   602 U.S. 680 (2024) ...................................................... *passim*

9
10

*United States v. Salerno*
   481 U.S. 739 (1987) ................................................................ 9

11
12

*Washington State Grange v. Washington State Rep. Party*
   552 U.S. 442 (2008) ................................................................ 9

13
14

*Wolford v. Lopez*
   116 F.4th 959 (9th Cir. 2024) .............................................. 10

15

**STATUTES**

16

Cal. Pen. Code
   § 25400, subd. (a) ................................................................. 2
17
   § 25850, subd. (a) ................................................................. 2
18
   § 26150 ........................................................................... 2, 3
   § 26155 ........................................................................... 2, 3
19
   § 26195, subd. (b)(1) .......................................................... 19
20
   § 26202 ............................................................................ 19
21
   § 26350, subd. (a)(1) ............................................................ 2

22

Cal. Veh. Code
23
   § 12801.5(a) ........................................................................ 3
   § 16400 .............................................................................. 3

24

Colo. Rev. Stat.
25
   § 18-12-203(1)(a) ................................................................. 7
26
   § 18-12-206 ......................................................................... 7

27
28

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

Second Amendment ........................................................................................... *passim*

Fourteenth Amendment ................................................................................ 11, 12

U.S. Const., Article IV, § 2, cl. 1 ..................................................................... 17

**COURT RULES**

Fed. Rules Civ. Proc. 56(a) ................................................................................. 3

**OTHER AUTHORITIES**

1 Commissioners of Statutory Revision, *Colonial Laws of New York from the Year 1664 to the Revolution* 40-41 (1894) ............................................ 13

*Firearm Localism*, 123 Yale L.J. 82 (2013) ............................................... 11

George Staughton, et al., *Charter to William Penn, and Laws of the Province of Pennsylvania, Passed between the Years 1682 & 1700* (1879) ................................................................................................................ 13

## NOTICE OF MOTION AND MOTION
## FOR SUMMARY JUDGMENT

**TO THE COURT, THE PARTIES, AND ALL COUNSEL OF RECORD:**

Please take notice that, at a date and time to be set by the Court, Defendant, Attorney General of California Rob Bonta (the "Attorney General") will and hereby does move for an order granting the Attorney General summary judgment under Federal Rule of Civil Procedure 56. Pursuant to this Court's August 7, 2024 Scheduling Order, ECF No. 14 at 3, this motion is excepted from Rule II.A of the Court's Chambers Rules.

The Attorney General's motion is made on the ground that there are no genuine disputes of material fact and the Attorney General is entitled to judgment as a matter of law on each of Plaintiffs' causes of action. Specifically, the Attorney General is entitled to judgment as a matter of law on Plaintiffs' first cause of action under the Fourteenth and Second Amendments because (1) the text of the Second Amendment does not cover the conduct in which Plaintiffs seek to engage; and (2) California's carry concealed weapons licensing laws are fully consistent with the principles underlying the Second Amendment. The Attorney General is entitled to judgment as a matter of law with respect to Plaintiffs' second cause of action, under the Privileges and Immunities Clause, because (1) the right to apply for a firearms license in a state other than the state in which one lives is not "sufficiently basic to the livelihood of the Nation" to trigger constitutional scrutiny under the Privileges and Immunities Clause and (2) the challenged state restriction is closely related to the advancement of a substantial state interest.

The Attorney General's motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the expert declarations of Robert Spitzer, Ph.D., Brennan Rivas, Ph.D., and Michael Vorenberg, Ph.D. and their Exhibits, the declaration of Cody Klucznik, the Declaration of Will Setrakian

1  and its Exhibit, all papers and pleadings on file in this action, the oral arguments of

2  counsel, and any other material or information the Court may properly consider.

3

4  Dated:  March 7, 2025                          Respectfully submitted,

5                                                 ROB BONTA
                                                   Attorney General of California
6                                                 MARK R. BECKINGTON
                                                   Supervising Deputy Attorney General
7                                                 NICHOLAS R. GREEN
                                                   Deputy Attorney General
8

9                                                  */s/ Robert William Setrakian*

10
                                                   _____
11                                                 WILL SETRAKIAN
                                                   Deputy Attorney General
12                                                 *Attorneys for Defendant Attorney
                                                   General of California Rob Bonta*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT & CROSS
MOTION FOR SUMMARY JUDGMENT (3:24-cv-00664-CAB-MMP)

## INTRODUCTION

Plaintiffs, three individuals who live outside of California and an advocacy organization, contend that California's carefully considered policy choice to limit applications for carry concealed weapons licenses ("CCW licenses") to California residents offends the United States Constitution. But the aspects of the law that Plaintiffs challenge do not implicate the plain text of the Second Amendment, are amply supported by the principles underlying the Second Amendment in any case, and are consistent with the requirements of the Privileges and Immunities Clause. Based on the undisputed evidence and a straightforward application of the Supreme Court's firearms jurisprudence, the Attorney General is entitled to judgment as a matter of law with respect to each of Plaintiffs' claims, for at least the following reasons.

*First*, Plaintiffs' proposed course of conduct is simply not covered by the plain text of the Second Amendment. Plaintiffs bear the burden of establishing their entitlement to Second Amendment protection at the first step of the Supreme Court's analysis set out in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), and they have failed to meet that burden here because California's laws do no more than ensure that those who are issued CCW licenses are permitted to carry them under the state's shall-issue licensing regime. That is reason enough to deny their motion for summary judgment on this claim and to grant the Attorney General's cross-motion.

*Second*, even if Plaintiffs' proposed course of conduct *did* fall within the plain text of the Second Amendment—and it does not—California's CCW licensing system is well-supported by the principles underlying the Second Amendment. Specifically, historical evidence demonstrates a history and tradition of firearms licensing, restricted to individuals whose dangerousness could be sufficiently vetted, including only state residents, on several occasions. The State's non-resident limitations work the same way that historical laws did, limiting licenses to

1

1    those the jurisdiction can reliably evaluate for dangerousness—its own residents.

2       ***Finally***, to the extent that California's CCW licensing program can be viewed

3    as creating a residency-based classification at all, this policy choice is plainly

4    related to a substantial state interest.  What is more, the right to apply for a firearms

5    license in a state other than the state in which one lives is not "sufficiently basic to

6    the livelihood of the Nation" to trigger constitutional scrutiny under the Privileges

7    and Immunities Clause. For those reasons, there is no violation of the Clause and

8    the Attorney General is entitled to summary judgment with respect to Plaintiffs'

9    second cause of action as well.

10                          **STATEMENT OF THE CASE**

11   **I.    STATUTORY BACKGROUND**

12       Subject to certain exceptions, it is generally a crime in California to carry a

13   firearm without a CCW license.  *See* Cal. Penal Code §§ 25400(a) (carrying

14   concealed firearm); 25850(a) (carrying a loaded firearm); 26350(a)(1) (openly

15   carrying an unloaded firearm).[1]  But like most states, California's CCW licensing

16   scheme follows the "shall issue" model, where local licensing authorities *must* issue

17   CCW licenses to applicants who meet statutory requirements and are not otherwise

18   prohibited from possessing firearms.  *See* §§ 26150; 26155.

19       CCW applicants are required to prove a number of elements to secure a license

20   under the "shall issue" scheme, including, *inter alia*, that they: (1) are "not a

21   disqualified person to receive such a license"; (2) are "at least 21 years of age"; (3)

22   are "a resident of the county or a city within the county" where they seek to apply,

23   or that their "principal place of employment or business is in the county or a city

24   within the county" where they seek to apply; and (4) have "completed a course of

25   training" in firearms safety.  *See* §§ 26150(a); 26155(a).

26

27   _____

28   [1] Unless otherwise indicated, all statutory citations are to the California Penal Code, all emphasis is added, and all internal quotation marks and alterations are omitted.

Relevant here, an applicant must provide "clear evidence of the person's identity and age[,]" §§ 26150(a)(2); 26155(a)(2), defined as either a "valid California driver's license" or a "valid California identification card issued by the Department of Motor Vehicles." § 16400. The effect of these provisions, taken together, is that only California residents may satisfy the requirements for a CCW license because only residents may obtain valid California identification. *See, e.g.*, Cal. Veh. Code § 12801.5(a).

## II. THE MATERIAL, UNDISPUTED FACTS

The three individual Plaintiffs are residents of states other than California. *See* Declaration of Christopher J. Hoffman, ECF No. 17-2, ¶ 2 ("Hoffman Decl."); Declaration of Chad Orrin, ECF No. 17-3, ¶ 2 ("Orrin Decl."); Declaration of Jennifer Sensiba, ECF No. 17-4, ¶ 2 ("Sensiba Decl."). Each of the named Plaintiffs avers (in identical language) that they "desire to carry a firearm in public for self-defense when I visit California and would do so if California law permitted me to." *See* Hoffman Decl. ¶ 7; Orrin Decl. ¶ 6, Sensiba Decl. ¶ 5. They further aver that they seek the "right to apply for a California concealed carry license[.]" Hoffman Decl. ¶ 7; Orrin Decl. ¶ 6; Sensiba Decl. ¶ 5. Each named Plaintiff avers that they are a member of organizational plaintiff Firearms Police Coalition ("FPC"). *See* Hoffman Decl. ¶ 8; Orrin Decl. ¶ 7; Sensiba Decl. ¶ 6.

### SUMMARY JUDGMENT STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" when it could "lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"The moving party has 'the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material lodged must be viewed in the light most favorable to the opposing party.'" *Avalos v. Baca*, 596 F.3d 583, 587 (9th Cir. 2010) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  But, where the non-moving party bears the ultimate burden of proof on a particular claim or defense, that party must produce "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id.*

## ARGUMENT

**I.    THE ATTORNEY GENERAL IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SECOND AMENDMENT CLAIM**

### A.    The Supreme Court's Second Amendment Jurisprudence

The Second Amendment codified a "pre-existing right" to keep and bear arms. *United States v. Perez-Garcia*, 96 F.4th 1166, 1182 (9th Cir. 2024) (quoting *Bruen*, 597 U.S. at 20).  The Supreme Court has instructed courts to evaluate the contours of Second Amendment claims by examining "constitutional text and history." *Bruen*, 597 U.S. at 22.  Using this text-and-history approach, courts conduct a two-step analysis when considering Second Amendment challenges to state regulation.

*First*, they determine whether "the Second Amendment's plain text covers an individual's conduct[.]" *Id.* at 24.

*Second*, if the Amendment's plain text covers the relevant conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*  In doing so, the

government need not identify a "'dead ringer' or a 'historical twin'" to justify its laws, but rather need show only that the law "comport[s] with the principles underlying the Second Amendment[.]"  *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (quoting *Bruen*, 597 U.S. at 30).

In conducting the historical inquiry, courts "recognize[] that the [Second Amendment] right was never thought to sweep indiscriminately."  *Id.* at 691; *see also District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) ("[T]he right secured by the Second Amendment is not unlimited.").  The Second Amendment accordingly does not amount to a "regulatory straightjacket[.]"  *Bruen*, 597 U.S. at 30.  Likewise, it does not prevent States from adopting a "'variety' of gun regulations," *id.* at 80 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636), or "experiment[ing] with reasonable firearms regulations" to address threats to the public, *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality opinion).  To that end, it "permits more than just those regulations identical to ones that could be found in 1791."  *Rahimi*, 602 U.S. at 692.  Plaintiffs challenging laws under the Second Amendment cannot rest on the assertion that the challenged laws are "by no means identical to these founding era regimes," because the laws "do[] not need to be."  *Id.* at 698.  The history-and-tradition test does not mandate "a law trapped in amber."  *Id.* at 691; 740 (Barrett, J., concurring) (explaining that historical regulations "reveal a principle, not a mold," to guide modern regulations).

Indeed, *Bruen* approved of states imposing licensing requirements that "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens'"—*i.e.*, the "people."  597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635).  Although the Supreme Court has defined the outer bounds of permissible regulations, it has not "abrogate[d]" states' "core responsibility" of "[p]roviding for the safety of citizens within their borders[.]"  *Kolbe v. Hogan*, 849 F.3d 114, 150 (4th Cir. 2017) (en banc) (Wilkinson, J., concurring) (quoting *Heller*, 554 U.S. at 635), *abrogated on other grounds by*

*Bruen*, 597 U.S. 1. Instead, the Supreme Court has repeatedly affirmed the important role states play in regulating firearms, consistent with our Nation's historical tradition.

In *Heller*, the Court emphasized that the right to keep and bear arms is "not unlimited"; states still possess "a variety of tools" to combat the problem of gun violence in a way that is responsive to the needs of their communities. 554 U.S. at 626, 636. The Court reiterated this point in *McDonald*, stressing that the Second Amendment "by no means eliminates" a state's "ability to devise solutions to social problems that suit local needs and values." 561 U.S. at 785. Recognizing that "conditions and problems differ from locality to locality[,]" *id.* at 783, the Court made clear that "state and local experimentation with reasonable firearms regulations" could continue "under the Second Amendment[.]" *Id.* at 785.

The Supreme Court's firearms precedents thus leave many Second Amendment questions for the States' political branches to decide, including several implicated in this case. *Bruen* "decide[d] nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun" and did not disturb any of the Court's prior statements "about restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 597 U.S. at 72 (Alito, J., concurring); *see also id.* at 81 (Kavanaugh, J., concurring) ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]"). And "nothing in [*Bruen*'s] analysis" called into question licensing regimes as a whole. *Id.* at 38 n.9 (approving laws requiring "a background check" or "firearms safety course").

Finally, a facial challenge, like Plaintiffs' here, is the "most difficult challenge to mount successfully," because it requires a plaintiff to "establish that no set of circumstances exists under which the [challenged law] would be valid." *Rahimi*, 602 U.S. at 693. "[T]o prevail, the Government need only demonstrate that [the challenged law] is constitutional in some of its applications." *Id.*

1    Under these principles, California's restrictions on CCW licenses for non-

2  residents are constitutional.  The law satisfies step one because ensuring that only

3  law-abiding individuals have access to firearms does not implicate the Second

4  Amendment's text.  If the Court nonetheless proceeds to step two, a robust

5  historical tradition illustrates states' ability to restrict firearm licensure to members

6  of a local community:  states (1) issued permits governing the possession and sale

7  of firearms, and (2) limited permits to those whose backgrounds could be vetted,

8  including to local residents.  And even if Plaintiffs could prevail individually, their

9  challenge is a facial one and they have not met the demanding standard for

10  completely invalidating California's non-resident restrictions.

**B.  Plaintiffs' Proposed Course of Conduct Is Not Covered by the Plain Text of the Second Amendment.**

13    California's licensing regime does not implicate the Second Amendment.

14  Plaintiffs bear the burden of showing that the Second Amendment's text covers

15  their conduct, *see B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 120 (9th Cir.

16  2024), and they have not met that burden.  The Second Amendment's text does not

17  mandate that a traveler be allowed to use a foreign state's license to carry in

18  California.  *Bruen*, 597 U.S. at 17 (textual inquiry examines whether "Second

19  Amendment's plain text covers an individual's conduct").  This flows from *Bruen*'s

20  holding that "nothing in [its] analysis should be interpreted to suggest the

21  unconstitutionality of" the 43 different "'shall-issue' licensing regimes" then in

22  effect.  *Id.* at 38 n.9.  These regimes included some jurisdictions that do not allow

23  non-residents to apply for carry permits (*e.g.*, Colo. Rev. Stat. §§ 18-12-203(1)(a),

24  18-12-206).  *Id.* at 13 & n.1.

25    Accordingly, California's law does not implicate the Second Amendment

26  because it ensures only that those authorized to publicly carry "are, in fact, 'law-

27  abiding, responsible citizens.'"  *Id.* at 38 n.9.  If an individual has not been

28  confirmed as law-abiding and responsible in the jurisdiction where he or she

1  proposes to carry, that individual presumptively does not fall within "the people" to

2  whom the Second Amendment refers. *See Bruen*, 597 U.S. at 31–32 (no dispute

3  that plaintiffs were part of "the people" because they were "ordinary, law-abiding,

4  adult citizens"); *Heller*, 554 U.S. at 635 (Second Amendment protects "the right of

5  law-abiding, responsible citizens to use arms"); *United States v. Nevens*, No. CR

6  19-774-DMG, 2022 WL 17492196, at *2 (C.D. Cal. Aug. 15, 2022) ("[E]ven after

7  defining the Second Amendment's text as presumptively extending to 'all

8  Americans' because it extend[s] to 'the people,' *Heller* drilled down, finding that

9  the Second Amendment in fact protected a significantly smaller subset of people:

10  'law-abiding, responsible citizens.'" (quoting *Heller*, 554 U.S. at 635)).

11      Plaintiffs frame the case as concerning only a citizen's right to "carry[]

12  firearms in public for self-defense." Plfs.'s Mot. for Sum. Jugmt., ECF No. 17-1

13  ("Mot.") at 6. But this misstates the right at stake—Plaintiffs seek the right to

14  apply for a concealed carry permit in California while maintaining a domicile

15  elsewhere. Plaintiffs may pursue the right to carry firearms in their home

16  jurisdictions. If Plaintiffs establish domicile in California, they may apply for and

17  obtain licenses, assuming they qualify under California law. What Plaintiffs may

18  not do, however, is judicially override California's permitting system based on their

19  preference for applying from outside of the state. California's limitations on who

20  may secure permits let the State confirm individuals' law-abiding status, *see*

21  Declaration of Cody Klucznik ("Klucznik Decl.") at ¶¶ 4–6, and so do not implicate

22  the Second Amendment at *Bruen* step one.

23      Even if the Court were inclined to accept Plaintiffs' argument, "[t]he

24  distinction between a facial and an as-applied challenge is important." *Project*

25  *Veritas v. Schmidt*, 125 F.4th 929, 939 (9th Cir. 2025). Plaintiffs "chose to litigate

26  th[is] case[] as [a] facial challenge[], and that decision comes at a cost." *Moody v.*

27  *NetChoice, LLC*, 603 U.S. 707, 723 (2024). "[F]acial challenges [are] hard to win."

28  *Id.*; *see also NetChoice v. Bonta*, — F. Supp. 3d —, 2024 WL 5264045, at *8 (N.D.

Cal. Dec. 31, 2024) ("Facial challenges to a law's constitutionality are disfavored"). They rely on speculation about possible applications of the law, forcing courts to anticipate cases instead of deciding the matter before them, and "threaten[ing] to short circuit the democratic process." *Washington State Grange v. Washington State Rep. Party*, 552 U.S. 442, 451 (2008). Courts thus apply a "most exacting standard[,]" *City of L.A. v. Patel*, 576 U.S. 409, 418 (2015)—if constitutional faults do not "occur in every case, they do not justify invalidating [a challenged law] on its face." *Rahimi*, 602 U.S. at 701 n.2; *see also Arizona Att'ys for Crim. Just. v. Mayes*, 127 F.4th 105, 107 (9th Cir. 2025) ("a facial challenge can succeed only when all a statute's applications would be unconstitutional"). Thus, "[a] facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 746 (1987).

Plaintiffs do not engage with this standard. They discuss how the named Plaintiffs are "law-abiding, responsible" individuals, Mot. at 3, but seek facial invalidation of the statute as to all persons residing outside of California, Compl., ECF No. 1, at Prayer ¶ 1. Thus, even if Plaintiffs could show that some out-of-state applicants fall within the Second Amendment's protection, Plaintiffs' challenge still fails because other prospective out-of-state applicants—say, those convicted of multiple violent felonies—could properly be barred by California from obtaining a carry permit because they fall outside of the Second Amendment's definition of "the People," making the law "constitutional in some of its applications" at step one. *Rahimi*, 602 U.S. at 693.

California's law thus passes *Bruen* step one and the Court need not proceed to the historical analysis, but as discussed below, the challenged law is amply justified by historical principles of firearm regulation at *Bruen* step two.

9

**C.    California's CCW Licensing Laws Are Consistent with the Principles Underlying the Second Amendment.**

The second step of the text-and-history analysis asks whether a state law "comport[s] with the principles underlying the Second Amendment[.]" *Rahimi*, 602 U.S. at 692.  In conducting this review, historical evidence must be "examine[d] . . . as a whole," rather than under a "divide-and-conquer approach." *Perez-Garcia*, 96 F.4th at 1191.  Throughout American history, states issued permits governing the possession and sale of firearms, and limited permits to those whose backgrounds could be vetted, including to local residents.  The challenged laws fit within this tradition.

**1.    Relevant Period**

Before evaluating the relevant history to discern the appropriate principle, the Court must determine what historical evidence qualifies.  Founding-era history unquestionably qualifies.  *Bruen*, 597 U.S. at 37.  But historical evidence from the time of the Fourteenth Amendment's ratification is relevant as well.  *See, e.g.*, *Wolford v. Lopez*, 116 F.4th 959, 987–89 (9th Cir. 2024) (relying on exclusively Reconstruction-era and later sources to uphold challenged laws at *Bruen* step two).  The Reconstruction period clarifies the right that was made applicable to the States in 1868.  *See Heller*, 554 U.S. at 605 (addressing the interpretation of the Second Amendment "through the end of the 19th century" and authorities "in the century after its enactment").  The Supreme Court has accordingly placed significant weight on the views of the Fourteenth Amendment's ratifiers.  *McDonald*, 561 U.S. at 778 ("the Framers *and ratifiers of the Fourteenth Amendment* counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty.").  It would be "incongruous" to ignore their understanding of the Second Amendment right and "define its scope and limitations exclusively by 1791 standards." *Antonyuk v. James*, 120 F.4th 941, 973 (2d Cir. 2024); *Bruen*, 597 U.S. at 35–36 ("a regular course of practice can liquidate & settle the meaning of

10

disputed or indeterminate terms & phrases in the Constitution"); *Heller*, 554 U.S. at 605 (explaining that an inquiry into post-ratification evidence "is a critical tool of constitutional interpretation"); *accord McDonald*, 561 U.S. at 770–78 (considering Reconstruction-era history in understanding the meaning of the arms right incorporated by the Fourteenth Amendment).

Reconstruction-era laws are especially relevant in this case. Licensing statutes in the States emerged as legal systems matured in the nineteenth century, "tailoring prohibitions to address public-safety threats posed by firearms-related activities rather than banning those activities outright." Expert Report and Declaration of Professor Robert Spitzer, Ph.D. ("Spitzer Decl.") at ¶¶ 27–28; ¶¶ 30–49 (giving examples). This regular course of practice sprung up as governments gained the facility to "gather[] and keep[] relevant information[,]" showing the value of considering Reconstruction-era sources in defining the Second Amendment's scope. *Id.* at ¶ 28.

### 2. Relevant Principles

California's licensing law finds strong support in history and tradition based on two interrelated principles supported by historical law: (1) issuing permits governing the possession and sale of firearms, and (2) limiting permits to those whose backgrounds could be vetted, including to local residents.

Firearm regulation at the state and local level, including localized approaches to licensing, has deep roots in American history and tradition. *See generally* Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82 (2013); *see also* Expert Report and Declaration of Professor Michael Vorenberg, Ph.D. ("Vorenberg Decl.") at ¶ 18. Colonies and states licensed the sale and transport of firearms beginning in early American history. Four colonies enacted such licensing laws in the 1600s. Spitzer Decl. at ¶ 22; Ex. C at 13–14 (Connecticut); 49 (Massachusetts); 77 (New York);

93 (Pennsylvania). Nine colonies or states did so in the 1700s. *Id.* ¶ 22[2]; Ex. C at 14 (Connecticut); 20 (Delaware); 26 (Georgia); 27 (Georgia); 49 (Massachusetts); 69–70 (New Jersey); 77–78 (New York); 93–95 (Pennsylvania); 100 (South Carolina); 110 (Virginia). And lawmakers in at least 32 states enacted 79 licensing requirement laws as a pre-requisite for weapons carrying or ownership during the 1700s and 1800s. Spitzer Decl. at ¶ 22; Exs. B, C. Throughout the Reconstruction period, localities and states enacted permitting systems to ensure that only law-abiding individuals possessed weapons. Vorenberg Decl. at ¶¶ 27–33, 34; Expert Report and Declaration of Brennan Rivas, Ph.D. ("Rivas Decl.") at ¶¶ 40–44, 46; Spitzer Decl. at ¶¶ 31–45. These Reconstruction-era laws survived legal challenge, illustrating the community understanding of their constitutionality. Vorenberg Decl. at ¶ 24. The "how" and "why" of these restrictions are comparable to the burdens and justifications of California's law: the laws required permits to carry weapons, including across state lines ("how") and vindicated the principle of protecting the local population ("why"). *Id.* at ¶¶ 23–24. They thus illustrate the historical principle of requiring a permit before an individual could carry weapons in a jurisdiction.

History also shows a tradition of states limiting permits to those whose backgrounds could be vetted, including local residents if necessary. Permitting ordinances were designed for local populations. *Id.* at ¶ 25. Accordingly, licenses were "typically [] provided for, and granted to, those who lived in the issuing jurisdiction." Spitzer Decl. at ¶ 49. That is reflected in historical laws restricting or prohibiting non-residents from carrying, trading, or hunting with firearms. *Id.* at ¶ 66. These specific restrictions advanced the principle "that only those persons acceptable to the local jurisdiction could possess firearms therein." *Id.*

---

[2]Some of these laws discriminated against enslaved Black individuals. Today such unacceptable and offensive discrimination would be plainly unconstitutional under the Fourteenth Amendment.

12

Specific historical statutes exemplify this principle.  Connecticut in 1642 barred selling guns "to any person inhabiting out of this Jurisdiction" unless the person possessed a license from a court or magistrate.  *Id.* at ¶¶ 55, 68. Massachusetts in 1633 also banned selling firearms to "any person inhabiting out of this jurisdiction."  *Id.* at ¶ 67.  New York in 1664 established that "[n]o person shall sell, give or Barter directly or indirectly any Gun or Guns, Powder, Bullett, shott, [or] Lead . . . Without Licence first had and obtained under the Governours hand and Seal, to any Indian whatsoever, nor to any person Inhabiting out of this Government."  1 Commissioners of Statutory Revision, *Colonial Laws of New York from the Year 1664 to the Revolution* 40–41 (1894).  Pennsylvania adopted a nearly identical law the same year that covered any "Gun or Guns[,] Powder, Bullet, shott [or] Lead," and prohibited sales to "any person Inhabitting out of this Government," without the Governor's direct authorization.  George Staughton, et al., *Charter to William Penn, and Laws of the Province of Pennsylvania, Passed between the Years 1682 & 1700*, at 32 (1879).  These laws establish a "distinct legal regime[]" specifically addressing the problem of non-resident carry.  *Rahimi*, 602 U.S. at 694.

Nineteenth century law further reflects this historical principle.  In 1880, the City of Brooklyn promulgated a law providing that "[a]ny person twenty one years of age and over . . . who has occasion to carry a pistol for his protection, may apply to the officer in command of the station house of the precinct *where* he resides, and such officer, if satisfied that the applicant is a proper and law abiding person" shall recommend that the Commissioner of Police issue him a permit.  Ordinance to Regulate the Carrying of Pistols, printed in the *Brooklyn Daily Eagle* (Oct. 26, 1880) (emphasis in original).  Non-residents could apply only if they did "business in the City of Brooklyn"—no provision allowed for the carrying of deadly weapons by persons with no "significant connection to the community."  *Id.*  In 1881, New York City required a license to carry concealed weapons, and among non-residents, only those non-residents who were doing "business in the city of New York, and

13

1  ha[d] occasion to carry a pistol while in said city" could "make application for

2  permission to do so." Spitzer Decl. at ¶ 71. Milwaukee limited firearms licenses to

3  city residents in 1896. *Id.* at ¶ 77. In 1899, Wyoming enacted a measure to allow

4  state residents to obtain a gun license for the sum of one dollar. *Id.* at ¶ 72. Non-

5  state residents could also obtain such a license, but for them the fee was forty times

6  higher than that of state residents: $40.00 (equal to $1519 in 2024 dollars). *Id.*

7  Georgia in 1910 required individuals to obtain a license before carrying a pistol or

8  revolver, but licenses had to issue from "the [] count[y] in which the party resides."

9  *Id.* at ¶ 74. Similarly, a 1912 New Jersey law required licensure to carry a firearm,

10  and required that such permits "be issued at the place of residence of the person

11  obtaining the same" and "recorded in the office of the clerk of the county where

12  granted." *Id.* at ¶ 75. Missouri and West Virginia included even-more-explicit

13  residency requirements in 1921 and 1925 respectively, allowing licenses to be

14  issued by only "the circuit clerk of the county in which the applicant for a permit

15  resides in this state" (Missouri) or to "a bona fide resident of [that] state for at least

16  one year" and "of the county" in which they filed their application applied for

17  "sixty days" (West Virginia). *Id.* at ¶ 76. Oregon took a similar approach in 1913.

18  *Id.* at ¶ 78. And the City of Madison likewise limited permits to city residents in

19  1917. *Id.* at ¶ 77.

20      Other states vindicated this principle by limiting out-of-state residents' ability

21  to use firearms for hunting purposes. North Carolina in 1768 disarmed non-citizens

22  who hunted inside the state; New Jersey followed in 1771, and South Carolina in

23  1855. Spitzer Decl. at ¶¶ 69–70. In 1876, Maryland enacted a similar hunting

24  restriction, as did Delaware in 1893. *Id.* at ¶ 70.

25      American history and tradition thus express a principle of states using licenses

26  to ensure that only law-abiding citizens keep and bear arms within a jurisdiction,

27  and restricting non-residents' ability to secure licenses as a historically enduring

28  method of vindicating that aim.

14

Plaintiffs' arguments to the contrary are unavailing and the Court should deny their motion for summary judgment.  First, they assail this historical principle as a whole—they recognize the principle that the state advocates but call it irrelevant here because their clients present no safety risk.  Mot at 10.  This argument ignores the historical tradition expounded above.  States licensed firearms to protect their citizens and limited those licenses to residents—irrespective of the qualifications of individual non-residents who sought to carry within the state.  *See, e.g.*, Spitzer Decl. at ¶¶ 49, 67, 68; Vorenberg Decl. at ¶ 25.  Plaintiffs' arguments clash with this history.  *See* Vorenberg Decl. at ¶ 23.  Plaintiffs also argue that allowing out-of-state residents to apply for licenses would pose "no public-safety risk."  Mot. at 10.  That is inaccurate:  California law-enforcement personnel utilize a state database to determine whether CCW licensees have been convicted of crimes that would require revoking their permits.  Klucznik Decl. at ¶¶ 4–5.  Obtaining such information would be difficult or impossible regarding residents of states that may not maintain the relevant information or may be unwilling to share it with California—California could unearth the relevant information only by querying a federal database, an administratively burdensome task and one that could leave California ignorant of disqualifying convictions.  *Id.* at ¶¶ 7–9.  And here, again, Plaintiffs' choice to challenge this law *on its face* undercuts their argument:  the Court would have to conclude that no public-safety risk would arise under any other state's possible handling of said information.  *See Rahimi*, 602 U.S. at 701 n.2 (unless constitutional faults "occur in every case, they do not justify invalidating [a challenged law] on its face").[3]

Plaintiffs offer little historical analysis themselves and instead attempt to dispute the historical tradition shown above by isolating minute distinctions between the historical analogues and California's identified law, "miss[ing] the

---

[3]Even if there were any merit to the dubious proposition that allowing out-of-state residents to apply would pose absolutely no public-safety risk, that is not the relevant inquiry:  *Bruen* instructs courts to consider only history and tradition.

15

forest for the trees." *Perez-Garcia*, 96 F.4th at 1191 (requiring courts to examine historical evidence "as a whole," rather than under a "divide-and-conquer approach"). This effort fails. Plaintiffs claim that the Massachusetts and Connecticut statutes, pre-Founding examples of restrictions on firearm ownership by non-residents, prohibited only trade with "Indians." Mot. at 10–11. That misreads the laws, which barred trade with "Indians" *or* any person not residing in the jurisdiction. Spitzer Decl. at ¶¶ 55, 67; Ex. C at 13–14 (Connecticut); 49 (Massachusetts); 77 (New York); 93 (Pennsylvania).

Next, Plaintiffs argue that the laws' "how" differs from California's, because those laws exempted travelers. Mot. at 12. Many historical carry restrictions included "travelers' exceptions" that let travelers carry weapons when in transit through the undeveloped American wilderness. Rivas Decl. at ¶¶ 47–53. These "narrowly defined" exceptions protected travelers from dangers like "robbers and predatory animals." *Id.* at ¶ 48. They "did not apply to everyday travel," instead covering travel only "in isolated and potentially dangerous places." *Id.* at ¶¶ 49, 53. Indeed, state supreme courts that interpreted these exceptions recognized that they applied to only active travel, and did not permit non-resident possession when a non-resident undertook a quick stop of even a few hours. *Carr v. State*, 34 Ark. 448, 449 (1879); *Smith v. State*, 50 Tenn. 511, 513–14 (1871). This narrow exception, borne out concerns about bandit attacks in the forests of early America, does not defeat the laws' relevance as analogues. *Rahimi*, 602 U.S. at 698 ("Section 922(g)(8) is by no means identical to these founding era regimes, but it does not need to be."). Plaintiffs' attacks on the New Jersey law that prohibited hunting by non-residents without a license similarly fails: although it addressed one particular harm associated with unregulated weapons possession, it still is "relevantly similar" to the "principles" underlying California's law because it limits carry and use of firearms to state residents to protect the public peace. *Id.* at 692. Demonstrating this, the law cited "divers[e] Abuses . . . and great Damages and

16

Inconveniences" that such untrammeled hunting had wrought.  Spitzer Decl., Ex. C at 70.  For similar reasons, the other laws collected by the State's experts showing a history of regulating non-residents' concealed carry reflect a historical principle undergirding the Second Amendment that allows state and local jurisdictions to limit the carrying of firearms to residents.

## II.    PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THEIR PRIVILEGES AND IMMUNITIES CLAUSE CAUSE OF ACTION

Plaintiffs' Second Cause of Action asserts that California's CCW licensing system "violates the Privileges and Immunities Clause because it favors California residents and discriminates against non-residents in the exercise of a fundamental right."  Compl. at ¶ 33.  As evidenced by Plaintiffs' invocation of *Bruen* within their Second Cause of Action, this claim amounts to a repackaged version of their Second Amendment claim.  *See id.* ¶ 32.  And as explained above, California's residency requirement for CCW applicants does not violate the Second Amendment at all.  Plaintiffs' alternative framing under the Privileges and Immunities Clause fares no better.

The Privileges and Immunities Clause provides that "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const., art. IV, § 2, cl. 1.  Because the Clause "was intended to fuse into one Nation a collection of independent, sovereign States[,] . . . it is only with respect to those privileges and immunities bearing on the vitality of the Nation as a single entity that a State must accord residents and nonresidents equal treatment." *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 279 (1985).  So, the first question in any privileges and immunities analysis is whether the activity in question is "sufficiently basic to the livelihood of the Nation as to fall within the purview" of the Clause.  *Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 64, (1988); *see also Marilley v. Bonham*, 844 F.3d 841, 846 (9th Cir. 2016) (en banc)

17

("At step one, the plaintiff bears the burden of showing that the challenged law falls within the purview of the Privileges and Immunities Clause.").  Only if the activity at issue satisfies this threshold inquiry do courts go on to consider the second aspect of a privileges and immunities analysis:  whether the restriction is "closely related to the advancement of a substantial state interest."  *Id.* at 65; *see also Marilley*, 844 F.3d at 846 ("If the plaintiff makes the required step-one showing, at step two the burden shifts to the state to show that the challenged law is closely related to the advancement of a substantial state interest.").  Plaintiffs' Second Cause of Action fails at both steps of this analysis.

*First*, the right to apply for a firearms license in a state other than the state in which one lives is not "sufficiently basic to the livelihood of the Nation" to trigger constitutional scrutiny under the Privileges and Immunities Clause.  As a number of courts have observed, the Supreme Court's privileges and immunities jurisprudence has focused almost exclusively on *economic* rights. *See, e.g.*, *Culp v. Raoul*, 921 F.3d 646, 657 (7th Cir. 2019) (collecting cases); *see also Piper*, 470 U.S. at 279–80 ("the Privileges and Immunities Clause was intended to create a national *economic* union").  Plaintiffs' activity—applying for a CCW license in California—is not related to economic activity in any specific sense.

Indeed, the right to apply for a CCW license is plainly distinguishable from, for example, the right to "the pursuit of a common calling[.]"  *United Bldg. & Const. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of City of Camden*, 465 U.S. 208, 219 (1984).  As the Seventh Circuit has observed, "we are . . . unaware of a decision holding that a privilege of citizenship includes . . . the right to carry a concealed firearm in another state[.]"  *Culp*, 921 F.3d at 657.  To put a point on it, the right to carry a firearm is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Heller*, 554 U.S. at 626.  Because Plaintiffs' activity is not within the scope of the Privileges and Immunities Clause's protection, the Court need proceed no further in

18

1  the analysis; the Attorney General is entitled to summary judgment on Plaintiffs'
2  Second Cause of Action.

3      **Second**, even if Plaintiffs' desire to apply for a CCW license in California *was*
4  covered by the Privileges and Immunities Clause—and it is not—Plaintiffs' claims
5  would still fail because any disparate treatment of non-residents is "closely related
6  to the advancement of a substantial state interest." *Friedman*, 487 U.S. at 65.

7      California, like most states, prohibits individuals with certain disqualifying
8  conditions from obtaining a CCW license. *See* § 26202. Disqualifying conditions
9  include restraining and protective orders and convictions for certain enumerated
10  types of criminal offenses, among other things. *See id.* Correspondingly, CCW
11  licensing authorities must revoke licenses when they determine that the license
12  holder is or has become a prohibited possessor under state or federal law. *See*
13  § 26195(b)(1).

14      Licensing authorities and the California Department of Justice have little
15  difficulty performing this on-going monitoring when it comes to California
16  residents because the Department of Justice participates in a "subsequent
17  notification" program. Klucznik Decl. at ¶ 4–5. Commonly known as a "RAP
18  Back" program, this system provides the Department of Justice and local licensing
19  authorities with immediate notification whenever a CCW license holder is arrested
20  or convicted of a crime *inside* of California. *See id.* at ¶ 4. California likewise has
21  programs that allow it to monitor for other disqualifying conditions, like domestic
22  violence restraining orders and mental health holds. *See id.* at ¶ 5. But these
23  programs do *not* notify the Department of Justice or local licensing authorities
24  when a CCW license holder is arrested or convicted for a disqualifying offense in
25  any other jurisdiction. *See id.* at ¶ 6. Nor do they alert authorities when a licensee
26  is subject to a restraining order or mental health hold outside the State. *See id.*
27  Instead, the Department of Justice and local authorities learn of disqualifying out-
28  of-state convictions only when running a full background check, something they

19

typically do only when a licensee seeks to renew their license.  *See id.* at ¶¶ 7–9.  In the case of a CCW licensee who is also a California resident, the potential lag time in reporting disqualifying conditions presents a relatively small risk because disqualifying convictions for California residents are far more likely to occur *in California*.  But in the case of a non-resident CCW license holder, the risk of an undetected disqualifying conviction is significantly higher; the only way the Department of Justice and local licensing authorities could adequately monitor for these disqualifying conditions is by continuously processing costly and administratively burdensome full background checks for non-resident licensees.  *See id.* at ¶¶ 7–10.  The burden associated with running full background checks would naturally increase with each non-resident CCW license holder, *see id.* at ¶ 10, and Plaintiffs acknowledge that Firearms Policy Coalition—just one of many firearms advocacy organizations—has had as many as 130,000 members in the last year, and only 3,600 of them currently reside in California.  *See* Declaration of Will Setrakian, Ex. A at 3.  It is fair to say that California can expect to receive at least tens of thousands of non-resident CCW applications if they are authorized, which would impose a significant monitoring burden on the State.

Put another way, "[t]he State can only monitor those activities that actually take place in [in the State].  *Bach v. Pataki*, 408 F.3d 75, 92 (2d Cir. 2005).[4] Because California's "ability to determine eligibility depends on access to information" and because the State "faces a substantial practical barrier—an information shortfall—when it comes to the mental health and criminal histories of out-of-state residents wishing to obtain a license[,]" there is a substantial justification for any disparate treatment of non-residents that might implicate the Privileges and Immunities Clause.  *Culp*, 921 F.3d at 651.

---

[4] As the Second Circuit has subsequently recognized, *Bach*'s holding that the Second Amendment is applicable only against the federal government did not survive *McDonald*.  *See United States v. Diaz*, 854 F.'Appx 386, 389 (2nd Cir. 2021).  That conclusion does not implicate *Bach*'s privileges and immunities analysis.

1    The Supreme Court has made clear that "States should have considerable

2 leeway in analyzing local evils and prescribing appropriate cures[.]" *Piper*, 470

3 U.S. 291. And as a number of Circuits have already concluded, the inability to

4 adequately monitor non-residents for disqualifying conditions amounts to "a

5 peculiar source of the evil at which the statute is aimed." *Bach*, 408 F.3d at 94; *see*

6 *also Culp*, 921 F.3d at 658 ("the Privileges and Immunities Clause . . . does not

7 force Illinois into a regulatory race to the bottom."). Adequate monitoring for

8 disqualifying conditions under California's shall-issue CCW scheme is a

9 compelling state interest and the non-resident restrictions on CCW applications are

10 closely related to furthering that interest. There is no violation of the Privileges and

11 Immunities Clause.

12    Plaintiffs' arguments to the contrary are not persuasive and the Court should

13 deny their motion for summary judgment. Their limited discussion focuses

14 exclusively on the fact that they "do not seek reciprocity based on their out-of-state

15 concealed carry licenses" and that they claim no entitlement to actually "obtain a

16 California concealed carry license without taking the same steps a resident would

17 have to take." Mot. at 16. But that argument misses the point; the non-resident

18 restrictions further a distinct state interest that Plaintiffs simply do not address at

19 all—the inability to effectively monitor non-residents for disqualifying conditions.

20 Moreover, even if Plaintiffs had identified the correct state interest, they provide no

21 meaningful analysis of tailoring. Instead, Plaintiffs quote generic language from

22 *Friedman* to assert that California "can protect these interests through other equally

23 or more effective means" without *ever* suggesting a *single alternative* themselves.

24 *Id.* (quoting *Friedman*, 487 U.S. at 69). That failure is reason enough to grant

25 summary judgment in the Attorney General's favor.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied and the Court should enter judgment as a matter of law in favor of the Attorney General.

Dated: March 7, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
NICHOLAS R. GREEN
Deputy Attorney General

*/s/ Robert William Setrakian*

WILL SETRAKIAN
Deputy Attorney General
*Attorneys for Defendant Attorney General of California Rob Bonta*

SA2024301668
44528234.docx

22